**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| COTTON PATCH CAFÉ | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. 1:09-CV-03242-MJG |
| MICROS SYSTEMS, INC. | * | |
| Defendant | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DEFENDANT MICROS SYSTEMS, INC.'S MOTION IN LIMINE**
**TO LIMIT TESTIMONY OF PLAINTIFF'S**
**EXPERT ROGER NEBEL**

Defendant Micros Systems, Inc. ("MICROS"), by its undersigned counsel submits this Memorandum in Support of MICROS' Motion in Limine to Limit the Expert Testimony of Plaintiff, Cotton Patch Café, Inc.'s ("Cotton Patch") Expert Roger Nebel.

Cotton Patch has proffered Roger Nebel to provide expert testimony on a number of issues in this case. Nebel's multitude of opinions are set forth in his Supplemental Report dated January 26, 2011, attached hereto as Exhibit 1 ("Nebel Report").

Nebel's area of expertise is the forensic examination of computer systems to determine whether there has been security breach and to try to determine how it occurred, security of computer systems and the contents of the Payment Card Industry Data Security Standards ("PCI-DSS") and its antecedents. Nebel has never worked in the restaurant industry, nor has he been involved in the development, sale, or servicing of Point of Sale Systems ("POS Systems") for that industry, nor the relationship between payment card vendors and their customers.

1

Based upon Nebel's report and deposition, he intends to express various opinions in this case that are either not expert opinions and/or are outside of his area of expertise. The subject areas of the inadmissible opinions which Nebel, intends to express include: (1) that MICROS made representations to Cotton Patch regarding the POS system in the Cotton Patch Nacogdoches restaurant, including that it complied with PCI-DSS requirements; (2) that Cotton Patch relied upon representations which MICROS made; (3) that MICROS withheld information from Cotton Patch which MICROS had a duty to disclose; (4) that MICROS had a continuing duty to Cotton Patch, after Cotton Patch purchased a MICROS POS system for the Cotton Patch Nacogdoches restaurant in 2001, to maintain the POS system in Nacogdoches in a manner compliant with the requirements of post 2001 evolving data security requirements; (5) the existence of, and MICROS' compliance with contractual and legal obligations which Nebel opines MICROS owed to Cotton Patch; (6) the purchasing habits, sophistication, and knowledge of restaurateurs, including Cotton Patch; (7) the sufficiency and quality of notices which MICROS gave to Cotton Patch in 2005 and at other times; (8) that it is common in the payment card industry for merchants such as Cotton Patch to outsource much or all of their information technology and for that reason that Cotton Patch outsourced its information technology to MICROS; and (9) Cotton Patch relied upon MICROS to keep it secure.

Virtually all of the opinions which Nebel intends to express in these areas are either not matters for which expert opinions are appropriate or are outside of Nebel's field of expertise.

## ROGER NEBEL'S BACKGROUND AND EXPERIENCE

Prior to 2009, Roger Nebel was certified as a qualified security assessor ("QSA"). In that regard he performed forensic examinations of computer systems to determine whether there was

an intrusion and the method by which the breach occurred. Exhibit 2, Nebel Dep., pp. 206-07.[1]

Nebel also performed audits of systems to determine whether they complied with security requirements applicable to various industries and he is knowledgeable regarding the provisions of the PCI-DSS and its antecedents. Nebel, however, has never worked for a payment card application vendor, except for one occasion when, as an independent contractor, his work was limited to a FACTA issue. Exhibit 2, Nebel Dep., pp. 207-09. He has not been involved in the relationship between payment card application vendors and customers in the restaurant industry. Exhibit 2, Nebel Dep. p. 330. He has no experience in the payment card application or the restaurant industries. Other than being employed in 1968 in his father's restaurant, which did not take credit cards, he has not worked in the restaurant industry. Exhibit 2, Nebel Dep., pp. 207.

After serving in the Navy as a Fire Control Technician and receiving a degree in engineering in 1991 from California Coast University, most of Nebel's professional career has been involved with computer issues in the defense and financial services industries. Nebel was employed by Planning Research Corp. a federal government contractor, where he performed work on a project for the Navy. Exhibit 2, Nebel Dep., p. 158. In 1996, Nebel and a colleague created and operated for a few months HomCom Internet Security, an internet security consulting firm, after which the company was sold and Nebel went to work for HomCom Communications, where he stayed until 1999. At HomCom Communications, Nebel was involved with internet banking software applications and was also involved with an internet insurance sales product. Exhibit 2, Nebel Dep., pp. 163-64, Exhibit 1, Nebel Report p. 3, ¶ 4. After HomCom ceased active business operations, Nebel, from 1999 to 2001, was employed by iDefense, which built a database identifying various types of malware which created security

---

[1] Nebel's certification terminated in 2009 after he joined his current employer.

vulnerability. Exhibit 2, Nebel Dep. pp. 166-67. From 2001 to 2005, Nebel was employed by TruSecure which performed similar services. Exhibit 2, Nebel Dep., pp. 166-67. After leaving TruSecure, Nebel worked from 2005 to 2009 for FTI Consulting performing forensic computer analysis and security auditing, in connection with which he worked as a QSA. He was also involved in performing audits of computer systems for compliance with applicable security requirements. Exhibit 2, Nebel Dep., pp. 168 – 69; Exhibit 1, ¶ 2. From 2009 to the present, Nebel has been employed by Defense Group, Inc. which is a software and services company whose primary customer is the Department of Homeland Security. Exhibit 2, Nebel Dep., pp. 169. Nebel's QSA certification was not renewed after he joined Defense Group, Inc.

Nebel's prior engagements as an expert have been limited to issues relating to information security standards applicable to a financial organization in possession of individuals' personal financial information, Exhibit 2, Nebel Dep., pp. 38-41; the quality of on line banking software, Exhibit 2, Nebel Dep., pp. 173-75; two disputes, neither of which involved Point of Sale Systems, in which there were allegations of copyright infringement and theft of intellectual property, Exhibit 2, Nebel Dep., pp. 176-78; a copyright royalty dispute involving music played by radio stations, Exhibit 3, pp. 178--80; and the adequacy of a data dictionary involving the Maryland Retirement System, Exhibit 2, Nebel Dep., pp. 180-81.

Nebel's sole experience with a security breach involving a MICROS POS Systems involved a single occasion where he reviewed a breach for a restaurant owner, which, as he conceded, did not rise to the level of a forensic examination. Exhibit 2, Nebel Dep., pp. 188 –

4

94, 199 - 200. He did not write a report, nor did he testify in connection with that incident. Exhibit 2, Nebel Dep., pp. 194 - 99.[2]

Nebel's professional experience does not qualify him to testify as to the relationship between MICROS and Cotton Patch. He is qualified to express opinions as to his examination of the hard-drive of the POS system that was in place at the Cotton Patch Nacogdoches restaurant at the time of the intrusion, and to give opinions about PCI-DSS, but he is not qualified to testify as to the duties payment card vendors owe to customers following the sale of POS systems to them or the various aspects of the relationship between payment card application vendors and their restaurant customers.

## ARGUMENT

### I.    The Standards for the Admission of Expert Testimony

Experiential expert testimony is admissible under Rule 702 so long as the expert offering experiential opinions can explain (1) how the expert's experience leads to the conclusions reached, (2) why the expert's experience provides a sufficient basis for the opinion offered, and (3) how the experts experience was reliably applied to the fact of the case." *United States v. Wilson*, 484 F. 3d 267, 274 (4th Cir. 2007).

An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact. *Id. Arista Records, LLC v. Usenet.com, Inc.,* 608 F. Supp. 2d 409, 424-25 (S.D.N.Y. 2009). Although an expert may rely on hearsay in forming expert opinions, an expert may not

---

[2]    Even though at page 2 of his first report, Nebel stated that he had been involved in investigating "many data security breaches, including payment card breaches at retailers who were running" the MICROS point of sale system "at the heart of this matter" Nebel reluctantly acknowledged at his deposition that he had only been involved with one previous breach involving a MICROS POS system, in which he neither performed a forensic investigation nor wrote a report or could identify the version of the POS System. Exhibit 2, Nebel Dep., pp. 199 - 200. He corrected the statement in his report by saying "I might have worded that a little bit better." Exhibit, 3, Nebel Dep., p. 198, line 11.

simply transmit that hearsay to the jury to give it added weight. *United States v. Mejia*, 545 F. 3d 179, 197-98 (2nd Cir. 2008).

Similarly, the factual assumptions supporting an expert's opinion should be excluded when those factual assumptions are not supported by the evidence. *Eastern Auto Distributors, Inc. v. Peugeot Motors of America, Inc.*, 795 F.2d 329, 337 (4th Cir. 1986)(excluding an expert's testimony because the expert's testimony "was based on assumptions which were speculative and not supported by the evidence."); *See also, Sparks v. Gilley Trucking Co.*, 992 F.2d 50, 54 (4th cir. 1993)(recognizing that "a court may refuse to allow a qualified expert to testify if his factual assumptions are not supported by the evidence.")

Fed R. Evid. 702 precludes expert testimony on matters "within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance." *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052 (4th Cir. 1986). "In determining whether a particular expert's testimony is sufficiently helpful to the trier of fact to warrant admission into trial, the district court should consider whether the testimony presented is simply reiterating facts already within the common knowledge of the jurors." *United States v. Lester*, 234 F. Supp2d 595, 599 (E.D.Va. 2002)(citing *United States v. Harris*, 995 F.2d 532, 534 (4th Cir. 1993)).

Expert witnesses are also precluded from offering expert testimony as to legal conclusions. To do so would be to usurp the role of the court. It is unquestionably "the responsibility - - and the duty - - of the court to state to the jury the meaning and applicability of the appropriate law, leaving to the jury the task of determining the facts which may or may not bring the challenged conduct within the scope of the court's instruction as to the law. *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 366 (4th Cir. 1986). As the Fourth Circuit has held, "it does not help the jury for an expert to give testimony that states a legal standard or draws a legal

conclusion by applying law to the facts because it supplies the jury with no information other than the witness's view of how the verdict should read." *U.S. v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011)(internal quotation marks omitted). "Courts have historically refused to admit testimony explaining matters of domestic law, as well as the interpretation of contracts and insurance policies." *Equal Access Education v. Merten*, 325 F.Supp. 2d 655, 662, n.12 (4th cir. 2004)(internal citations omitted.)

## II. Inadmissible Expert Testimony Proffered by Roger Nebel

### a. The Court Should Limit Nebel From Expressing Expert Opinions Regarding Alleged Representations He Claims Were Made By MICROS And His Opinions Regarding Cotton Patch's Reliance Upon Such Representations, And The Reasonableness Of That Reliance.

Nebel's Report is replete with opinions regarding representations which he asserts MICROS made to Cotton Patch, Cotton Patch's alleged reliance upon the alleged representations and the reasonableness of that reliance. For instance, Nebel opines:

- That MICROS was Cotton Patch's "trusted vendor." Exhibit 1, Nebel Report, p. 23, ¶ 43.

- That MICROS represented to Cotton Patch that its POS system complied with the prevailing data security standards and that Cotton Patch relied upon that representation. Exhibit 1, Nebel Report, p. 7, ¶ 12

- That MICROS represented to Cotton Patch that MICROS would maintain the MICRO POS System installed at the Cotton Patch Nacogdoches restaurant in a secure manner compliant with PCI and other relevant data security standards. Exhibit 1, Nebel Report, p. 26, ¶ 49, bullet point 4 on the page.

- That MICROS misrepresented to Cotton Patch that the POS System at the Nacogdoches restaurant was secure and compliant with prevailing industry

7

standards, and failed to disclose that in fact they were non-compliant." Exhibit 1, Nebel Report, p. 26, ¶ 49, bullet point 5 on the page.

- That on or about March 2006, Cotton Patch asked MICROS for and obtained an oral representation from MICROS that Cotton Patch's POS systems were adequately updated to avoid fines and comply with current industry requirements." Exhibit 1, Nebel Report, p. 21 - 22, ¶ 39.

- That MICROS represented to Cotton Patch that its reliance was trustworthy. "Cotton Patch was led to believe that MICROS was handling the compliance needs of Cotton Patch, and in some cases this reliance was justified." Exhibit 1, Nebel Report, p. 12, ¶ 22.

- MICROS had an obligation and responsibility to Cotton Patch to maintain the MICROS POS System installed at the Nacogdoches location in a PCI compliant manner. This obligation and responsibility arose as a result of MICROS' oral representation to Cotton Patch, the parties' ongoing relationship, and through the unique knowledge that only MICFROS possessed about its application and the PCI compliance status of the POS equipment and software at the Nacogdoches location." Exhibit 1, Nebel Report, p. 26 - 27, ¶ 49, bullet point 6 on page 26.

- Cotton Patch was relying upon MICROS to maintain Cotton Patch's system in a reliable and secure manner which MICROS failed to do." Exhibit 1, Nebel Report, p. 28, ¶ 53.

Nebel's expertise is in the area of forensic examination of computer security systems and the contents and evolution of cardholder data security requirements. Nebel is not qualified to give expert opinions as to the substance of MICROS' alleged representations to Cotton Patch, whether

or not Cotton Patch relied upon the alleged representations and the reasonableness of that reliance. Those are issues of fact for the trier of fact to determine after hearing the evidence. It is for the trier of fact to determine whether or not MICROS made representations to Cotton Patch, whether from the evidence Cotton Patch relied upon the representations, and whether that alleged reliance was reasonable.

The testimony about representations amounts to no more than Nebel's regurgitating the hearsay statements of Cotton Patch's witnesses and saying that they should be believed and Nebel's personal view that Cotton Patch relied upon and was deceived by MICROS. It would be inappropriate to try to pass these opinions off as expert opinions in order to give added weight to Cotton Patch's interpretation of the evidence. *See, Scott,* 789 F.2d at 1052 (4th Cir. 1986)(holding that Fed. R. Evid. 702 precludes expert testimony on issues within the common knowledge of jurors).

The jury does not need Nebel to tell them what MICROS said and to highlight what Cotton Patch did, or did not do in response. It will decide that from the factual evidence presented to it.

> ### b. The Court Should Preclude Nebel's Testimony Regarding Restaurant Industry Practices and Cotton Patch's Knowledge and Sophistication.

In his Report Mr. Nebel opines:

- "Cotton Patch is not in the IT provision business and relied upon MICROS to fill that role." Nebel Report, p. 12, ¶20

- "Cotton Patch necessarily depended upon MICROS to understand the needs of Cotton Patch, including the need for a secure and ultimately PCI DSS compliant product." Nebel Report, p. 12, ¶21

- "Cotton Patch's practice of "buying as it goes" from MICROS is very common, and the original sales contract between Cotton Patch and MICROS relating to the Nacogdoches restaurant affects this ongoing relationship. Exhibit 1, Nebel Report, p. 11, ¶19.

- It is common in the retail payment card industry — which includes banks, merchants, payment application vendors, and service providers — for smaller, relatively unsophisticated merchants such as Cotton Patch to outsource much or all of their Information Technology (IT) service provision to a vendor such as Micros. Exhibit 1, p.11, ¶ 19.

- "This type of relationship [on-going 'per call' contractual/invoice relationship] with MICROS for upgrades, maintenance, trouble shooting and other services] is a typical way for small merchants to conduct business." Nebel Report, p. 115 ¶ 28.

- MICROS failed to fulfill its obligations to Cotton Patch by failing to maintain Cotton Patch' POS system in a manner compliant with relevant data security standards. Nebel Report, p. 7, ¶12

- "A reasonable POS vendor would have taken many more steps and precautions to ensure that its customer, with whom it had an ongoing business relationship, was operating securely with respect to its use of the vendor supplied POS equipment and software." Nebel Report, p. 30, ¶ 56.

These opinions are not based on Nebel's professional specialized knowledge and experience. His opinions about Cotton Patch's sophistication are for the jury to decide, not for Nebel to instruct them about.

Nebel has never worked in the payment card industry. He has not worked in the restaurant industry. He has no experience with regard to the relationship between payment card vendors and customers to whom payment card vendors sell their POS products or the type and manner by which post sale services are provided by payment card vendors and under what circumstnaces.

Nebel's professional experience relating to the conduct of forensic examinations and audits of computer systems to determine whether the system is in compliance with applicable security requirements, does not qualify him to give opinions regarding the post sale duties payment card vendors owe to restaurant customers.

Whether or not Cotton Patch is "a relatively unsophisticated merchant[]" and whether and for what it relied upon MICROS to do are questions of fact for the trier of fact, not for Nebel to opine about. Nebel has no experience with regard to what is typical or not in connection with the post sale relationship between POS systems purchasers and the vendors from whom they purchase POS systems. He does not have the experience to opine whether or not such relationships are normally based upon service contracts or are pay as you go or involve hiring third parties to service systems. At his deposition, Nebel conceded that he was not aware of standards or data on this subject. Exhibit 2, Nebel Dep., pp. 329-30, 358-61. Nebel's opinions on issues such as this are simply his personal subjective views and not expieriential expert opinions.

Similarly, Nebel's opinion that "Cotton Patch's practice of 'buying as it goes' from Micros is very common" in the industry, Ex. 2, p.11, ¶ 19, is something about which he has no knowledge. Due to his lack of experience, Nebel does not know what is a common practice or not in the payment card industry, and acknowledged in his deposition that he has not reviewed

any studies or data from which he could render such an opinion. Exhibit 2, Nebel Dep., pp. 327-31, 358-61. There is no basis for this opinion. It is rank speculation, and should be excluded. *Oglesby,* 190 F.3d at 250.

Nebel is also in no position to opine that MICROS' "[f]ailing to communicate or remediate these [POS system] deficiencies is not a common practice, in the industry. Here again Nebel neither has experience nor is relying upon any studies or empirical data for the statement. Moreover, the opinion ignores that Cotton Patch declined to enter into a contractual relationship with MICROS to obtain software upgrades as they were issued. While it may be convenient to Nebel's sponsor to speculate that automatically upgrading software is a common industry practice which MICROS failed to employ, Nebel does not have a basis to express such an opinion. He is not in a position to testify as to what is or is not a common practice in the restaurant application software industry, because he has neither worked in or studied it. Providing upgrades, and the circumstances under which they are provided in the payment card application industry is simply something he is not experienced and knowledgeable about.

### c. Nebel Should Not Be Permitted To Express Expert Opinions Regarding Duties He Alleges MICROS Owed To Cotton Patch.

At several places in his report, Nebel offers the opinion that MICROS owed contractual, legal, and payment card industry obligations to Cotton Patch. For instance, Nebel opines:

- "In my opinion Cotton Patch clearly relied upon MICROS, indeed necessarily had to rely upon MICROS as the exclusive owner of the proprietary system to provide a software product and ancillary products and services that complied with the obligations inherent with possessing electronic payment card transactions." Exhibit 1, Nebel Report, p. 28, ¶ 51.

- "MICROS failed to fulfill its obligations to Cotton Patch by failing to maintain Cotton Patch' POS system in a manner compliant with relevant data security standards." Exhibit 1, Nebel Report, p. 7, ¶12.

- "Failing to communicate and remediate these deficiencies is not a common practice." Exhibit 1, NebelReport, p. 13, ¶22.

- "A reasonable POS vendor would have taken many more steps and precautions to ensure that its customer, with whom it had an ongoing business relationship, was operating securely with respect to its use of the vendor supplied POS equipment and software." Exhibit 1, Nebel Report, p. 30, ¶56.

When Cotton Patch purchased the POS system for Nacogdoches in 2001, the payment card industry standards did not exist. Nebel is in no position based on his experience to opine that payment card application vendors had a duty, after the standards were later issued, and as they evolved, to upgrade systems purchased prior to the time standards were issued. Having not worked in the payment card vendor or user industry, he is not in a position to opine as to what was the industry standard after VISA first issued standards, which were directed solely at banks and merchants. He is also not qualified to interpret contracts between Cotton Patch and MICROS or to opine as to legal duties.

Nebel also intends to give the opinion that "[i]n similar breach investigations I have noted common and default userids and passwords as an endemic issue at other food service locations using Micros POS products."[3] Exhibit 2, pp. 19-20, ¶35. Nebel, however, at his deposition testified that he has not been involved in any forensic investigations involving MICRO products. He was involved in just one review of an unidentified version of a MICROS system. Nebel

---

[3] Ex. 2, p. 19-20, ¶ 35.

testified that the breach in that case was the result of an employee downloading malware which was sent by e-mail not the use of common or default uderids and passwords. Exhibit 2, Nebel Dep., pp. 188-91. Furthermore, Nebel's statement is not only misleading because it infers multiple previous investigations of breaches involving MICROS products, but also states that the use of common userids and passwords has been an endemic MICROS issue when Nebel's singular previous MICROS related breach analysis resulted from an employee downloading malware. The opinion should be excluded because it is contrary to Nebel's experience and therefore does not represent the reliable application of specialized knowledge to the facts of the case as required under Fed. R. Evid. 702.

Nebel states in his Report that "Cotton Patch indicates that they do not recall receiving any of the Micros documents regarding compliance with PCI, and that even if Cotton Patch had received them, they would have asked Micros as their trusted vendor to address the issues."[4] Exhibit 1, p. 23, ¶43. In this instance Nebel attempts not only to state his client's position regarding whether it received notices from MICROS but also to opine on what Cotton Patch's response would have been to the notice. The opinion should be precluded (1) because it involves no more than an attempt by Nebel to state Cotton Patch's position regarding whether or not it received a notice from MICROS and (2) involves the entirely speculative conclusion as to what Cotton Patch's reaction to the receipt of the notice might have been. Nebel is in no position to speculate as to what Cotton Patch's actions after receipt of the notice might have been. He has no way of making such a guess.

Nebel offers conclusions as to MICROS' obligations to Cotton Patch and MICROS' compliance with these obligations. The following factual and legal conclusions should be excluded because they invade the province of the Court, are not helpful to the trier of fact, and are

---

[4] Ex. 2, p.23, ¶ 43

wholly unsupported by Mr. Nebel's expertise.

- Cotton Patch, necessarily depended upon Micros to understand the needs of Cotton Patch, including the need for a secure and ultimately PCI DSS compliant product. Exhibit 1, Nebel Report, p. 12, ¶22.

- Cotton Patch was led to believe that Micros was handling the compliance needs of Cotton Patch, and in some cases this reliance was satisfied. Exhibit 1, Nebel Report, p. 12, ¶22.

- Micros was aware of critical security deficiencies in the Micros products at the Nacogdoches location that Micros failed to adequately communicate to Cotton Patch. Exhibit 1, Nebel Report, p. 12, ¶22.

- The behavior of the parties supports that Cotton Patch continued to rely upon Micros for modifications as necessary. Exhibit 1, Nebel Report, ¶31.

- Based upon the behavior of the parties over the years whereby Cotton Patch would call Micros for support and Micros would provide that support to Cotton Patch, it is clear that Cotton Patch continued to rely on Micros in the ensuing years for software and system support and upgrades, albeit on a per-call invoice basis. Thus Micros and Cotton Patch continued to have mutual obligations, the parties' behavior was consistent with those obligations, and Cotton Patch in turn relied on that continuing relationship and obligation. Exhibit 1, Nebel Report, ¶31.

- It is clear to me that this reliance occurred over a long period of time -- from at least 2001 and continuing even today. Exhibit 1, Nebel Report, ¶36.

- In my opinion, Micros, during the time leading up to the alleged breach, failed in

its obligations to Cotton Patch as a payment application vendor and as the exclusive provider of POS products and services to Cotton Patch to provide a secure and PCI compliant POS system. Exhibit 1, Nebel Report, p. 27, ¶50.

- In my opinion, Cotton Patch was reasonably diligent in relying upon Micros for compliance with the relevant requirements and for the security of card holder data at Cotton Patch. Moreover, Cotton Patch's reliance was reasonable given its relative lack of sophistication in the data security field, Micros' instructions that Cotton Patch was to "stay out" of the Micros system, the representations made by Micros regarding the security of the system, and the frequent maintenance performed by Micros on the POS system installed at the Nacogdoches restaurant. Exhibit 1, Nebel Report, p. 28, ¶52.

- In my opinion, Micros was in the best position to know, and in fact did know, that the version of Micros operating at the Cotton Patch Nacogdoches location prior to the alleged data, security breach discussed in the Trustwave report was non-compliant with applicable PCI standards and vulnerable, and that Cotton Patch was relying upon Micros to maintain Cotton Patch's system in a reliable and secure manner, which Micros failed to do. Exhibit 1, Nebel Report, p. 28, ¶53.

Factual conclusions are only admissible to the extent that they serve as the basis for the reasonable application of Nebel's technical experience and result in an admissible expert opinion. Conclusions about the knowledge and behavior of the parties, Cotton Patch's reliance on communications from MICROS, the meaning of those communications, MICROS' legal obligations to Cotton Patch, MICROS' compliance with those obligations, and the diligence of the parties have nothing to do with Nebel's expertise which is in the forensic examination of the

POS system at Cotton Patch's Nacogdoches restaurant and the contents of PCI-DSS, which during the relevant time period in this case was directed at merchants not payment application vendors. Nebel's proposed testimony on these issues is highly prejudicial in that it offers the jury no more than Cotton Patch's argument dressed up as Nebel's expert opinions for which he has no specialized knowledge or experience which qualifies him to render the opinions.

### d. Nebel's Proposed Testimony Regarding the Knowledge of the Parties and the Adequacy of Communications Between the Parties Should Be Excluded.

Although Nebel's technical experience is in the area of computer software and hardware, to include the forensic examination of POS systems which have been breached, Nebel in his report repeatedly asserts conclusions relating to the parties' knowledge in reference to issues which are not the result of his forensic examination of the POS system at the Nacogdoches restaurant or any other area of inquiry in which Nebel possesses specialized knowledge which would assist the trier of fact. Nebel's proposed testimony in the following areas should be excluded.

- Throughout the parties' relationship, Micros maintained control over the RES system installed at Cotton Patch's Nacogdoches restaurant. Indeed, Micros directed Cotton Patch employee Alan Mann from 2001 to 2007 to "stay out" of the operational system." As the relationship went on, Micros became aware of multiple vulnerabilities in the Micros RES system, and specifically with vulnerabilities in the Micros RES system running and maintained by Micros at Cotton Patch's Nacogdoches location. Despite this knowledge, Micros failed to adequately communicate information to Cotton Patch about the many deficiencies in the RES POS system until it was too late to prevent a breach. Exhibit 1, Nebel Report, p. 16, ¶29.

- In 2004, Micros is clearly seen as controlling access to the Cotton Patch POS systems when they ask for permission to add a new, shared user for some reporting requirements. Micros, not Cotton Patch, directly controls new users accessing the system over the Internet and Cotton Patch simply approves what Micros is asking for. Exhibit 1, Nebel Report, p. 18, ¶33.

- Both of these vulnerabilities were violations of the existing PABP standards of which Micros was well-aware. Exhibit 1, Nebel Report, p. 19, ¶34.

- On or about June 15, 2007 Visa published a list of compliant payment applications that included Micros RES version 3.2 SP 7 HF5. The list indicated that this version of Micros RES, which Cotton Patch did not have at its Nacogdoches location, was compliant as of December 31, 2006. Again, Micros failed to communicate that to Cotton Patch. Exhibit 1, Nebel Report, p. 22, ¶41.

- As shown in this report, Micros was in a position to know about and/or remedy all these issues before the alleged breach occurred. Exhibit 1, Nebel Report, p. 23, ¶44.

- Despite this knowledge and its representations to Cotton Patch regarding the security and compliance of the Nacogdoches system, Micros failed to upgrade the Nacogdoches POS system or adequately notify Cotton Patch of these serious vulnerabilities. Exhibit 1, Nebel Report, p. 25, ¶47.

- Micros repeatedly failed to adequately communicate or follow-up with Cotton Patch regarding the failure of the Micros system installed at the Cotton Patch Nacogdoches location to comply with PCI DSS and other relevant data security standards. Exhibit 1, Nebel Report, p. 27, ¶49.

- Micros' failure to adequately notify Cotton Patch prior to August 17, 2007 of the serious security vulnerabilities present in the Micros system installed at Cotton Patch's Nacogdoches restaurant is inexcusable in light of Micros' awareness of the vulnerabilities prior to that time, its awareness of relevant data security standards, and its representations to Cotton Patch concerning its responsibility to maintain a safe and secure POS system at, among others, the Cotton Patch Nacogdoches location. A reasonable POS vendor would have taken many more steps and precautions to ensure that its customer, with whom it had an ongoing business relationship, was operating securely with respect to its use of the vendor-supplied POS equipment and software. Given the large fines and serious reputational repercussions that accompany data security breaches, this failing on the part of Micros gave rise to an extreme risk that Cotton Patch (and its customers) would suffer substantial financial harm. Exhibit 1, Nebel Report, ¶56.

The foregoing statements by Mr. Nebel about MICROS and Cotton Patch's awareness of various issues in relation to the POS system at Cotton Patch's Nacogdoches restaurant do not serve as the basis for an expert opinion. They relate to factual matters for the jury to decide based on the presentation of evidence to it. These are not opinions based upon specialized knowledge or Nebel's experience in the payment application card holder industry. Nebel repeatedly seeks to offer conclusions regarding the effectiveness of notices, Cotton Patch's resulting knowledge, and ultimately the reasonableness of the parties' actions. Expert testimony is not for the purpose of providing the trier of fact with factual conclusions a party wishes them to reach. Such testimony is prejudicial and inadmissible. The conclusions rest on no more than the bare assertion of Nebel himself. As such they are connected to the evidence in this matter by no more than the *ipse dixit* of Nebel and therefore

should be excluded. *Casey* 823 F. Supp. 2d 334, 340-41. "[C]onjectural opinion testimony should be excluded under Rule 403 because whatever minimal probative value it may be said to possess clearly is substantially outweighed by the danger of confusion." *Id.* at 348 (quoting *Samuel v. Ford Motor Co.*, 112 F. Supp. 2d 460, 470 (D. Md. 2000)). Under Fed. R. Evid. 702, courts "employ[] a flexible standard, the aim of which is to prevent the fact-finder from being unduly swayed by opinions, presented as expert judgments, that in fact amount to no more than informed speculation." *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011).

### e. Nebel Should Not Be Permitted To Opine That MICROS Negligently Installed Malware Into The Cotton Patch Server When It Was Installed In 2006.

Nebel has expressed the opinion in this case that MICROS was negligent and responsible for the insertion of malware into the server at Nacogdoches at the time the new server was installed in March 2006. Inasmuch as there is no breach of contract claim in the case and the negligence claims which Cotton Patch previously asserted have been dismissed, this opinion is not relevant and will only serve to confuse the issues that will be before the jury at trial.

### III.   CONCLUSION

For the foregoing reasons, MICROS respectfully requested that Mr. nebel be precluded from offering the conclusions and opinions discussed above because they do not represent the reasonable application of specialized knowledge in a manner which will assist the trier of fact in resolving a factual issue, impermissibly advance legal conclusions within the province of the Court, and

prejudicially seek to offer the trier of fact Mr. Nebel's speculative opinions and the positions fo Cotton

patch under the guise of expert testimony.

Respectfully submitted,


_____/s/ Steven A.Allen_____
Steven A. Allen (Federal Bar No. 00607)
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland 21204
410.938.8800
SAllen@PKLaw.com

Attorney for Defendant MICROS Systems, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of April 2013, a true and correct copy of the foregoing Motion In Limine and proposed Order were served via e-filing and first class mail, postage prepaid on:

Robert L. LeMay
Michael C. Christman
Kane Russell Coleman & Logan, P.C.
1601 Elm Street, Suite 3700
Dallas, Texas 75201
*Attorneys for the Plaintiff*

Craig D. Roswell (Bar # 433406)
Niles, Barton & Wilmer, LLP
111 South Calvert Street, Suite 1400
Baltimore, MD 21202
*Attorneys for the Plaintiff*

Chad Pinson
Ryan L. Bangert
Baker Botts, LLP
2001 Ross Avenue
Suite 600
Dallas, Texas 75201-2980
*Attorneys for the Plaintiff*

/s/ Steven A.Allen
Steven A. Allen (Federal Bar No. 00607)
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland 21204
410.938.8800
SAllen@PKLaw.com

Attorney for Defendant MICROS Systems, Inc.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| COTTON PATCH CAFÉ | * | |
|     Plaintiff | * | |
| v. | * | Civil Action No. 1:09-CV-03242-MJG |
| MICROS SYSTEMS, INC. | * | |
|     Defendant | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**ORDER**

It is this \_\_\_\_\_ day of _____ 2013,

ORDERED that the Motion in Limine of MICROS Systems, Inc. to limit the testimony of Plaintiff's Expert Roger Nebel is hereby GRANTED.

_____ /s/ _____
Marvin J. Garbis
United States District Judge
