**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

COTTON PATCH CAFÉ, Inc.                    *

     Plaintiff                                   *

v.                                                    *          Civil Action No. 1:09-CV-03242-MJG

MICROS SYSTEMS, INC.                       *

     Defendant                                  *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DEFENDANT MICROS SYSTEMS, INC.'S REPLY TO COTTON PATCH CAFÉ, INC'S
OPPOSITION TO MICROS' MOTION IN LIMINE TO LIMIT
TESTIMONY OF ROGER NEBEL**

     Defendant MICROS Systems, Inc. ("MICROS"), by it undersigned counsel submits this Reply Memorandum In Support of its Motion In Limine to Limit Testimony of Plaintiff's Expert Roger Nebel.

     In its Opposition to MICROS' Motion in Limine, Cotton Patch, while conceding that it would be improper for its expert Roger Nebel to offer expert testimony on a number of the issues upon which Nebel expressed what he characterized as  "expert opinions" in his reports and deposition,  asserts that Nebel should nonetheless be permitted to express expert opinions about customs and practices applicable to the Point of Sale Industry, and the relationship between Point of Sale Systems vendors and their customers, even though Nebel has never worked in the industry and does not have any training or experience with regard to these issues.  Except for his time with Forensic Technologies, ("FTI"), where Nebel performed forensic examinations, and what Cotton Patch refers to as "compliance auditing," which by example consisted of assisting a hospital with a self-assessment of whether its POS system was in compliance with cardholder industry data security requirements, Cotton Patch asserts that Nebel, a man for all seasons, can

1

express opinions about the customary relationships and practices in an industry in which he has not worked, involving vendors, for whom he has not worked, and restaurants and similar merchants, for whom he has also not worked.  Nebel's work history is bereft of experience dealing with the subjects about which Cotton Patch states in its Opposition it intends to proffer Nebel as an expert.

In its Opposition Cotton Patch has identified five subjects where Nebel is not qualified to express opinions about which it intends to proffer Nebel as an expert:

1.   Whether it is common for merchants such as Cotton Patch to outsource their Information Technology ("IT") services and data security functions to third party service providers, often on a "buy-as-you go" basis (Opposition at pp. 1 & 8);

2.   Whether it is common and expected for a software vendor like MICROS to promptly notify its customers about security vulnerabilities and flaws in the vendor's software, the manner in which software vendors typically communicate with their customers regarding security vulnerabilities, the form of that notice and whether MICROS' notices were effective and complied with industry standards.  (Opposition at pp. 1 & 8);

3.   Whether Cotton Patch could "properly rely upon" MICROS' alleged  representations about the security and compliance of the MICROS POS system when assessing its data security needs (Opposition at pp. 1 & 8);

4.   Whether Cotton Patch is a relatively sophisticated merchant with respect to IT security issues compared to other merchants that outsource their IT security function (Opposition at pp. 8-9); and

5.   Whether the relationship between Cotton Patch, as a consumer of software and IT services, and MICROS, as a provider of software and IT services, was customary and typical of an IT outsourcing relationship (Opposition at p. 9).

Nebel has no experience which qualifies him to give expert opinions regarding the sale and post sale relationship between product vendors and their customers, under what circumstances customers contract with their product vendors to obtain various post sale services

2

as opposed to contracting with third parties, and what services particular vendors offer as opposed to services which must be obtained from third parties such as IT security outsourcing companies.

Nebel has no experience with regard to post sale relationships between vendors and their customers for after sale services, whether by way of service contracts or pay as you go. He has no experience with regard to the customary post sale practices of hardware and software vendors including what are common vendor industry practices relating to under what circumstances vendors customarily notify customers with regard to anything relating to previously purchased hardware and software.  Nebel may have worked as an IT security outsourcing consultant, and he may know what services companies who provide IT security outsourcing services do with regard to services they are specifically hired by their customers to perform, including notifying clients of IT security issues, which is what they were hired to do as IT security service provider, but that is different from the post sale relationship between product vendors and their customers, about which Nebel has no experience.

With regard to the quality, and effectiveness of notices, Nebel is not a human factors expert.  Nebel's personal opinions regarding the quality, wording and effectiveness of a post sale notice to a customer is no more than Nebel's personal opinion.  The jury is in the same position as Nebel to evaluate the quality, wording and effectiveness of a post sale customer notice, such as the Notices which MICROS gave Cotton Patch, notwithstanding that Cotton Patch repeatedly ignored those notices.  Similarly, whether or not Cotton Patch "could properly rely upon MICROS' alleged representations is a question for a jury, not Nebel's compensated, subjective and biased opinion.  The same is true for the level of Cotton Patch's sophistication.  Whether or not Cotton Patch relied upon representations allegedly made by MICROS and whether Cotton Patch is a sophisticated merchant which a jury can decide based upon the evidence without

3

superimposing the judgment of an alleged expert into the jury room.  These are issues about which Nebel should be permitted to substitute his judgment for that of the jury.

Finally, whether the relationship between Cotton Patch and MICROS was customary and typical of an IT outsourcing relationship is neither relevant to this case, nor an issue about which Nebel has experience in the context of the post-sale relationship between vendors and customers who, after purchasing a product, sometimes purchase post-sale services from their vendors, either by way of service contracts or on a time and materials basis, or services from third parties.  Some clients personally service the products they purchase.  Others contract with one or more third party service providers to provide different types of services, maintenance, replacement parts or components or security audits and consulting.  Other customers purchase post-sale services from their product vendor, depending upon what type of post-sale services the vendor provides, and go elsewhere for services the vendor does not provide.  A jury does not need an expert to describe these scenarios.  Moreover, Nebel's experience does not provide a basis for him to testify as an expert what is "typical" or not in this industry.

## ARGUMENT

In considering a challenge to the admission of expert testimony, a court must be cognizant that, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). (internal quotation marks omitted). Expert testimony must be excluded which is based only "on belief or speculation." *Oglesby v. Gen. Motors Corp.* 190 F. 3d 244, 250 (4th Cir. 1999).

Experiential expert testimony is permitted.  *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 345 (D. Md. 2011).  In order to be reliable under Fed. R. Evid.

702, however, the experiential opinions of an expert witness must truly be grounded in experience. *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007).

Whether an expert's opinions are based on experience or not, experts are precluded from offering legal conclusions because such opinions invade the province of the court, are not helpful to the jury, and do no more than offer the expert witness' view of how the verdict should read. *U.S. V. Offill*, 666 F.3d 168, 175 (4th Cir. 2011). Similarly, expert testimony is only admissible to aid the jury in understanding matters beyond their common knowledge and common sense.   An expert's opinion may not be used to substitute the expert's judgment for that of the jury. *U.S. v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); s*ee also, United States v. Scop,* 846 F.2d 135, 139-40, *modified,* 856 F.2d 5 (2d Cir.1988). An expert opinion on an issue within the common knowledge of the jury, must be excluded because such matters are for the jury's determination and the expert's proffered opinion would be of no assistance in helping the jury reach a decision. *Scott v. Sears, Roebuck & Co.,* 789 F.2d 1052, 1055 (4th Cir.1986); *United States v. Barsanti*, 943 F.2d 428, 433 (4th Cir. 1991).

I.   **THE AREAS IN WHICH MICROS CONCEDES NEBEL IS QUALIFIED TO OFFER EXPERT TESTIMONY**

Cotton Patch, in its Opposition, begins it arguments by listing the subject matter areas in which it claims MICROS has conceded that Nebel is qualified to offer expert testimony. (Opposition at p. 6.)   Although MICROS strongly disputes the accuracy of many of Nebel's opinions, it does not dispute that he can qualify to give expert testimony regarding (1) his forensic examination of the POS System at the Cotton Patch Nacogdoches restaurant and (2) payment card industry data security standards ("PCI-DSS"). Cotton Patch's claim, however, that MICROS has conceded that Nebel is qualified to opine on the "general operation and structure of the payment card industry," is misleading. (Opposition at p. 7.)   While Nebel may have sufficient

5

experience and knowledge to discuss the path through which credit card transactions flow from the merchant to the transaction processor, and the route by which the authorization and information about the transaction travels back to the merchant, MICROS does not concede, but rather contests Nebel's qualifications to testify as an expert regarding the relationship between developers and vendors of Point of Sale systems used in the restaurant industry and merchants, such as Cotton Patch.  Nebel does not have a sufficient and reliable experiential basis for expert opinions in this area and his personal opinions regarding this subject would not be helpful to the trier of fact. *United States v. Wilson*, 484 F.3d at 274.

## II.     NEBEL'S EXPERIENCE DOES NOT PROVIDE A BASIS FOR HIM TO GIVE OPINIONS REGARDING THE SALE AND POST-SALE RELATIONSHIP BETWEEN VENDORS AND MERCHANTS.

Cotton Patch's strategy is to try to artificially broaden the description of Nebel's experience through repeated reference to his having been involved with several companies which provide IT security outsourcing services.  That strategy, however, ignores the dearth of Nebel's experience in the specific areas germane to the opinions which Cotton Patch seeks to obtain from Nebel, the post-sale relationship between vendors and customers and the quality and effectiveness of vendor notices.

Cotton Patch argues that since Nebel has worked in the IT outsourcing business, Nebel can broadly opine about the relationship between product vendors and their customers, an area, which a review of Nebel's professional experience shows he has not been involved.  Simply because this case involves a security breach after a product was sold does not qualify Nebel to opine on the customs and practices of virtually any industry simply because there may be computer security issues in that industry.  Nebel, however, has no experience in POS, the vendor/customer, involving the relationship between product vendors and merchants.  That is a subject about which he seeks to express an opinion outside of his experiential bailiwick.

The non-sequitur which Cotton Patch champions, that Nebel's experience with security outsourcing and cardholder industry security standards, malware and the forensic analysis of computers, qualifies Nebel to give opinions regarding the relationship between the owner of the computer and the company which sold it to them, including the types of services vendors provide post-sale does not follow.   Having worked in the "IT security outsourcing" business is not a substitute for not having the necessary experience to express opinions about the relationship, both at the time of sale and thereafter, between vendors and merchants and the human factors analysis as to what is or is not an effective notice, areas in which he has no specialized experience.

### 1.      Nebel's Professional Experience

When Nebel was asked at his deposition whether he had ever worked in the restaurant industry, Nebel testified that his sole experience working in that industry was in or about 1968, when he worked in his father's restaurant, possibly as a busboy.   **Exhibit 1**, Nebel Dep., pp. 207:9 – 19. There is nothing in that experience, which long pre-dated computer Point of Sale systems and the transmission of information over the Internet,   which would provide any basis for the opinions which Nebel intends to give about the relationship between Point of Sale system vendors and their restaurant customers.

From 1974 to 1980, Nebel served in the Navy, primarily aboard submarines as a fire control technician. **Exhibit 1**, Nebel Dep., pp. 150:4- 151:16. That experience provides no basis for Nebel's opinions in this case.

Nebel received a Bachelors of Science degree in engineering from California Coast University in 1991.  **Exhibit 1**, Nebel Dep., pp. 148:12- 149:9.  Nebel's school work involved a mix of civil, mechanical, electrical, and chemical engineering. *Id.*  The degree, however, was not in the area of computer science or computer engineering, and he took no course work having

anything to do with the sale and post-sale relationship issues about which he has been proffered as an expert.

Nebel's Master's degree in Management from National-Louis University provides no basis for his opinions in this case. **Exhibit 1**, Nebel Dep., pp. 158:20- 159:7.  His specialty - management succession plans - is not one of the issues which Cotton Patch has proffered Nebel to give expert testimony about in this case.  **Exhibit 1**, Nebel Dep., pp. 159:15 -161:10.  Nebel does not even claim in his Affidavit that the work he performed to obtain his Masters provides an educational or experiential basis for his opinions in this case.

From 1987 to 1996, Nebel worked for a company named Systems Exploration, SEI, which provided on-site computer support services to the Navy.  **Exhibit 1**, Nebel Dep., pp. 157:4 - 158:19.  Again, experience wholly unrelated to the opinions at issue.

During the period 1996 to 1999, Nebel worked for HomeCom Internet Security Services, renamed HomCom Communications ("HomCom"). **Exhibit 1**, Nebel Dep., pp. 163:4- 164:21. At his deposition, Nebel testified that "we were involved in building an Internet Banking product and building an insurance selling product.  **Exhibit 1**, Nebel Dep., pp. 164:18- 165:3.  **Exhibit 1**, Nebel Dep., pp. 164:3 – 165:3.  In paragraph 5 of his Affidavit to Cotton Patch's Opposition, Nebel adds that "I led Internet security consulting projects for major financial institutions including Pershing and Citibank and I conducted security audits on Internet banking sites."

Putting aside that the new information about leading Internet security consulting projects was not mentioned during his earlier deposition testimony, that experience, and the experience with major financial institutions and banking sites would not qualify Nebel to give opinions regarding the sale and post sale relationship between POS System vendors and their customers and what is typical in those post-sale relationships.  The HomCom experience would also not

qualify Nebel to give opinions regarding post-sale product notices from vendors or their effectiveness.

From 1999 to 2001, Nebel worked for IDefense.  He testified during his deposition that

> at IDefense we built a database of security vulnerability in computer software and the vendor patches where there were patches.  We also reported on Malware.
>
> Remember I said earlier . . . all of the anti-malware companies have their own naming conventions and they don't always agree.  So the reason there is 400,000 names for malware is because anti-malware companies come up with their own naming schemes.
>
> . . . So we tracked all of that, as well to help customers understand that when you see malware with this name it's really the same malware as these other guys reported.  So we did malware analysis.

**Exhibit 1**, Nebel Dep., pp. 166:13 – 167:14.  In paragraph 5 of his Affidavit, Nebel now conveniently recalls "I worked with software vendors to craft appropriate notices of vulnerabilities and patches for distribution to the software end users."  None of the so called "software vendors" however are identified in the Affidavit, nor has any information been provided as to what Nebel actually did vis a vis the notices, presumably providing the "software vendors" with the names and descriptions of malware, which is what IDefense did.

Notwithstanding that Nebel knew at the time of his deposition that post-sale notices to Cotton Patch and the quality and effectiveness of the wording of such notices had been put in issue in this case by Cotton Patch, Nebel must have forgotten at his deposition his alleged work with notices at IDefense?  When asked at his deposition about notices, including about why he changed his initial report from the claim that MICROS did not give notice to Cotton Patch, to MICROS did not "adequately" give notice, surely a question which would have spurred such a recollection, Nebel curiously failed to mention his work "crafting" notices at IDefense which Cotton Patch now claims supports Nebel's experiential qualification to express expert opinions

about  notices, including the quality and effectiveness of the Notices MICROS gave to Cotton

Patch.  **Exhibit 1**, Nebel Dep. 353:13 – 354:3.[1]

Nebel claims that at TruSecure, where he worked from 2001 to 2005, he "became

familiar with customary practices in the "IT security outsourcing industry."   Notwithstanding,

there is no evidence in this case that MICROS was a part of the "IT security outsourcing

industry" – it did not hold itself out or perform services as an "IT security outsourcing" business[2]

---

[1]     Since Nebel left this information out of his deposition testimony, he was not deposed about it.

[2]     MICROS is in the business of developing Point of Sale Systems for the restaurant industry and providing post-sale technical servicing of those systems when requested to do so. After 2003, MICROS addressed security issues involving Point of Sale System as related to credit card data by developing upgrades to its existing systems and developing a new version of its POS system, version 4.0, which ultimately was certified as PABP compliant.  It, however, never held itself out as an IT security company or as providing post-sale IT outsourcing services. As Cotton Patch repeatedly stated in connection with its attack upon Mr. Walsh, MICROS is not an IT security outsourcing company.

During the depositions of Alan Mann, Cotton Patch's Director of Operations, and Earl Morrison, Cotton Patch's Controller, Mann and Morrison each confirmed that MICROS never told Cotton Patch that MICROS would serve as Cotton Patch's IT security consultant or general IT consultant.  Mann testified:

> Q.  Did anyone from MICROS ever use the word - - the word "security consultant" to you personally in the context of describing what MICROS would do or was doing for Cotton Patch such as, we are or we will be, quote, "your security consultant"?
>
> A.  No, sir.
>
> Q.  Did anyone from MICROS ever use the words "IT consultant" or "computer consultant" to you in the context of MICROS is or will be the Cotton Patch, quote, "computer consultant" or, quote, "IT consultant?"
>
> A.  No, sir.

**Exhibit 2**, Mann Dep. pp. 234:18 to 235:3.

Morrison testified:

- Nebel's experience at TruSecure in the validation of the Exxon Mobil Speedpass, whatever that involvement may have substantively been, or providing IT security outsourcing services to Internet banks, payment processing companies who processed credit card and other transactions over the Internet and retail merchants who used the Internet, does not qualify Nebel to testify about the sale and post-sale relationship between a POS System vendor and its customer.[3]

---

Q.   Did anyone from MICROS ever say to you personally that MICROS is your security consultant for computers?

A.   Personally to me?

Q.   Yeah.  Or words to that effect?

A.   Not that I remember.

Q.   Is that not that you remember because you don't think it happened, or it might have happened it might not?

A.   I don't think it happened.

Q.   Okay.  Did anyone form MICROS ever personally say to you that it was the computer consultant to Cotton Patch?  Anyone ever use those words "computer consultant"?

A.   Not really.

Q.   Did anybody from MICROS ever use the words "IT consultant" to you personally?

A.   To me personally, no.

Q.   Okay.  Did you ever hear anyone from MICROS utter those words to someone else?  Whether they were talking to Larry or Mike, or anybody, and you overheard the conversation, or the statement where a MICROS" person said to that person "we're your IT consultant"?

A.   I have no memory of ever hearing that.

**Exhibit 3**, Morrison Dep. pp. 80:6 – 81:4.

[3]      At his deposition Nebel described his work at TruSecure as involving malware analysis and validating the Exxon/Mobil Speedpass for PABP compliance - which he described as

From 2005 to 2009,  Nebel was employed by FTI Consulting as a qualified security assessor ("QSA"). **Exhibit 1**, Nebel Dep., pp. 168:15 - 69:2, 203:20 - 204:7. At FTI, Nebel performed forensic investigations of computer systems and conducted security audits to determine compliance with relevant data security standards. *Id.*  He testified at his deposition that while at FTI he assisted Catholic Healthcare West with a self assessment audit, advising Catholic Healthcare West of what they had to do to "fill out the form" associated with the self assessment and what it needed to do to become compliant "in order to answer the questions honestly and correctly."  **Exhibit 1**, Nebel Dep. pp. 200:16 – 204:7.[4]    That experience does not provide a basis for Nebel to testify about the sale and post-sale relationship between Point of Sale system vendors and their customers.[5]

---

installing the Speedpass in a lab and testing it.  **Exhibit 1**, Nebel Dep., pp. 406:4-8, 632:8-14. In paragraph 7 of his Affidavit, Nebel expanded the description of his work at TruSecure to include overseeing a "defined security program," a fancy term which he did not describe or define, and providing information security services "to over 1000 customers, including internet banks, retail merchants and payment processing companies," which security services are similarly not described.

[4]    In contrast to Catholic Healthcare West, Earl Morrison, Cotton Patch's Controller testified that when American Express, in November 2006, required Cotton Patch to participate in a self assessment audit, which was performed in March 2007, Cotton Patch, rather than telling MICROS that it was directed to perform a self assessment audit and asking for MICROS' help, ignored MICROS and responded on its own to the self assessment and lied in answers to questions in the self assessment questionnaire to ensure that it would pass the audit.  **Exhibit 3**, Morrison Dep. pp. 136:3 – 146:16.  Cotton Patch did not reply on MICROS to be its security consultant for if it did, Cotton Patch would have sought MICROS' assistance in dealing with the self assessment audit.

[5]    In paragraph 8 of his Affidavit, Nebel boasts that "[w]hile at FTI I conducted a breach investigation and remediation of a restaurant chain using a MICROS POS product. "  As with all else Nebel, that claim greatly exaggerates his experience.

In Nebel's report in this case he stated that he has been involved with "many data security breaches, including payment card breaches at retailers who were running the Micros Point of Sale ("POS") system at the heart of this matter" **Exhibit 1** to MICROS' Motion In Limine, Nebel Report at p.2, ¶1.  When his statement was tested during deposition Nebel reluctantly conceded that he misstated his experience and had only been involved with a breach involving a single

Since 2009, Nebel has worked for Defense Group, Inc., whose primary customer is the Department of Homeland Security. **Exhibit 1**, Nebel Dep., pp.169:6-17.   As noted in his Affidavit, Defense Group, Inc. also provides services to state, federal and local government clients.  The Defense Group, Inc.  experience is wholly unrelated to the issues which Cotton Patch has proffered Nebel will testify about regarding sale and post sale relationships, industry practices, notices, etc.

Nebel has never worked for a payment card application vendor, except as a contractor on one occasion involving a FACTA issue – FACTA is not involved in this case.  **Exhibit 1**, Nebel Dep., pp. 207:20-209:8.  He has not been involved in the relationship between payment card application vendors and their customers.  **Exhibit 1**, Nebel Dep., p. 330:3-18.

As of the date of his deposition, Nebel's sole limited involvement as a testifying witness involved an evaluation of a product used in online banking, a case involving copyright infringement, intellectual property theft; a proceeding before the Copyright Royalty Board involving the streaming of music; and a deposition in a matter involving the State of Maryland

---

retailer which uses a MICROS POS system, not multiple "retailer<u>s</u>." Nebel also conceded that he obtained the assignment through an attorney at Baker Botts, one of the firms representing Cotton Patch in the instant case.  **Exhibit 1,** Nebel Dep. pp.  187:17 – 189:2, 198:1 – 199:1.  Nebel stated that he could not recall whether he "looked at" the breach in 2006 or 2007, he could not identify the type or version of the POS system, and could not say whether it was an RES 3000, the system involved in the instant case.  He testified that the hacker, similarly to the situation with Cotton Patch, "came in through PC Anywhere," which the evidence in the instant case will show Cotton Patch enabled 24/7 even though it was told by MICROS not to do so, leaving the door to its POS system environment wide open to intrusion.  Nebel testified that he was "not hired to do a forensic analysis" and did not even write a report.  **Exhibit 1,** Nebel Dep. pp. 187:12 – 200:5.   Notwithstanding this testimony, where Nebel was forced to stay within the perimeters of accurate facts, Nebel, in his Affidavit ballyhoos and exaggerates his experience to make it appear that it was greater than it in fact was.

Retirement System, regarding the adequacy of a data dictionary.   **Exhibit 1,** Nebel Dep. pp. 173:11-181:16.[6]

Nebel has never published a peer reviewed article or been published in a peer review journal.  **Exhibit 1,** Nebel Dep. pp.  399:16-402:21.  At most, Nebel has had a couple of brief items, which did not involve studies or any expert analysis, published in a non-peer reviewed magazine, neither a professional journal nor a respected industry source, owned by a company called Tech Target, which operates online venues.   **Exhibit 1**, Nebel Dep. pp. 53:8-62:20, 399:16-402:21.  At his deposition he testified that he was not sure, but he might have also written a piece in the nineties for something called Firewall Newsletter.  **Exhibit 1**, Nebel Dep., p. 61:6-9.  The pieces were entitled "Securities Tips and News Letters Topics, Hashing For Fun and Profit, the Mystified Encryption for PCI-DSS" and the other piece was entitled "How to Avoid Regulatory Stink" which appeared in a newsletter called Corporate Compliance Regulatory Newsletter.  **Exhibit 1,** Nebel Dep. pp. 58:1-60:9.  He also wrote a piece for Tech Target on "FACTA Red Flags" that was not published in favor of someone else's piece.  **Exhibit 1,** Nebel Dep. pp. 54:3-55:12.  None of Nebel's publishing provides a basis for the opinions he seeks to give in this case. [7]

---

[6]    Cotton Patch has not provided any updated information on the subject of cases in which Nebel has testified at trial or by deposition since his deposition in this case.

[7]    Nebel's penchant for exaggerating his qualifications was further illustrated during his deposition when he was asked whether he had written any peer reviewed publications. Notwithstanding that "peer reviewed" is a term of art in the expert community, of which Nebel claims to be a member, Nebel asserted that he did because his co-worker at FTI reviewed an article of his before it was submitted.  **Exhibit 1**, Nebel Dep. 399:16 - 402:12.

III.   **NEBEL IS NOT QUALIFIED TO OPINE THAT IT IS COMMON FOR MERCHANTS SUCH AS COTTON PATCH TO OUTSOURCE THEIR INFORMATION TECHNOLOGY SERVICES AND DATA SECURITY FUNCTIONS TO THIRD PARTY SERVICE PROVIDERS OFTEN ON A "BUY AS-YOU-GO" BASIS OR WHETHER THE POST-SALE RELATIONSHIP BETWEEN MICROS AND COTTON PATCH WAS A TYPICAL IT OUTSOURCING RELATIONSHIP.**

A fair review of Nebel's professional work experience demonstrates that Nebel is not qualified in this case to give the opinion that merchants such as Cotton Patch typically outsource their information technology services and data security functions to third party service providers often on a "buy as-you-go" basis. He also has no experience or basis of knowledge upon which to categorize MICROS as an IT security service provider.

Cotton Patch wants to introduce Nebel's opinions that the relationship between Cotton Patch and MICROS was a typical security outsourcing relationship, between a merchant and IT security services provider, on a common pay as you go basis to support its position that Cotton Patch relied on MICROS to be its IT Security Services Provider and that MICROS owed Cotton Patch post-sale duties with regard to PCI-DSS. Cotton Patch wants to use this contrived opinion to deceptively argue that by purchasing post sale services from MICROS on a time and materials basis, Cotton Patch effectively outsourced its IT security services to MICROS and that MICROS had a continuing duty to upgrade Cotton Patch's POS system to address evolving security issues, even though Cotton Patch did not purchase a yearly Software Enhancement License or Help Desk Maintenance contract, the contractual basis under which Cotton Patch would have been entitled to all POS system upgrades from MICROS, including various functional performances and security upgrades.

Nebel's experience provides no basis for him to express opinions regarding MICROS' ongoing duties, if any, to Cotton Patch after the sale of the POS system for the Nacogdoches restaurant. He has no experience from which to opine whether MICROS' relationship with

Cotton Patch was typical of outsourcing relationships in the POS industry, or whether it is customary for vendors such as MICROS to provide IT security services to customers after the sale of a POS System as cardholder industry data security requirements evolve.  Nebel may have his own subjective personal opinions on these issues, but he does not have the experiential qualifications to pass them off as expert opinions.

Cotton Patch's attempt to use Nebel's generalized experience in the IT security industry to give specialized opinions regarding the commonality of post-sale industry practices between POS systems vendors such as MICROS and merchants such as Cotton Patch is simply a bridge to far. In doing so Cotton Patch seeks to have Nebel wander so far afield from his specific experience that all semblance of reliability is lost and the opinions become no more than speculation.

> ### A.   COTTON PATCH'S ATTEMPT TO CATEGORIZE NEBEL'S CONVERSATION WITH KIRK LAUGHLIN AS RELIABLE RESEARCH TO FILL THE VOID RESULTING FROM NEBEL'S LACK OF EXPERIENCE IS UNAVAILING.

Cotton Patch argues in its Opposition that Nebel's conversation with Kirk Laughlin, described as a "professional colleague who studies the outsourcing and insourcing markets" was "an investigation" that was "more than adequate to support Nebel's opinion."   It makes that argument to try to bolster Nebel's glaring lack of an experiential basis to support his opinions. Cotton Patch's attempt, however, is unavailing.

Nebel testified during his deposition:

> Q     Take a look at paragraph 19 of your report. You say in the first sentence that it's common in the retail payment card industry for smaller relatively unsophisticated merchants, such as Cotton Patch, to outsource much or all of their information technology. Do you see that?
>
> A     Yes.
>
> Q     Okay what is the basis for that conclusion?

A      It's my experience that smaller merchants tend to outsource their IT function.

....

Q      All right. Now – so there's no data or statistics in the industry that supports this conclusion?

A      No, it's just my experience.

Q      Now going down two more sentences you write, Cotton Patch's practice of buying as it goes from MICROS is very common. Is there any data in the industry on that subject?

A      Again, this is just my experience. For very small organizations you **could** certainly have an ongoing contract, but if your service calls were few and far between, you **might** just do it on a time and materials basis.

Q      Well, you've never worked for a payment application vendor, correct?

A      Other than as a contractor, no.

Q      You've never been an employee of a company that sells POS systems?

A      That's correct.

Q      Have you ever done a study to determine what percentage of customers of companies that sell POS systems buy as they go as opposed to purchase service contracts of some type?

A      No, I've they never done a study.

Q      Do you know if anybody has?

A      There are probably studies.

Q      Well, having never performed that study, how is it you're able to conclude that that's a common practice?

MR. PINSON: Objection asked and answered.

THE WITNESS: I have a colleague, his name is Kirk Laughlin and he runs a website called Insourcing, Strategic Insourcing. And basically his job is to study the outsourcing and insourcing market. And it gets even a little more complicated because you can buy as you go, you can outsource, you can bring it back-in-house—and that's called insourcing. So I've spoken with Kirk. We've

17

> presented at conferences before. So this is based on my
> conversations with Mr. Laughlin.
>
> ....
>
> Q     He hasn't provided you with any data?
>
> A     No.

**Exhibit 1**, Nebel Dep., pp. 327:2- 331:13 (Emphasis Added).

Nebel's purported conversation with Laughlin does not provide an adequate basis for Nebel's opinions. Nebel conceded that he was not aware of the substance of Laughlin's alleged research or studies.   Yet, he tries to pass off an alleged conversation with someone, whose research and data he has not seen or evaluated, to justify his lack of experience for his subjective speculative personal opinion.

An expert who seeks to base his opinions on the research of others must "come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.' One means of showing this is by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 470 (M.D.N.C. 2006)(internal citation omitted).   Nebel has utterly failed to do so.   Nebel reviewed no data regarding Laughlin's alleged research; there is no indication whether said research, if conducted, was conducted in accordance with sound scientific principles; there is no indication that Laughlin's findings were subjected to peer review; there is not even any indication that Nebel actually read the research or that it's been published someplace where anyone interested in the subject could review it.   It would be impossible to even cross-examine Nebel on the subject, because of the total lack of information provided by him, other than he has "spoken with Kirk" at some unknown time and place.   There is no indicia of reliability to support Nebel's reliance on Laughlin's alleged statement.

This problem is compounded by the fact that Nebel, himself, has no experience from which he can express the opinion. He repeatedly refers to "my experience," but an analysis of his professional history demonstrates that he has no experience in this area – "my experience" is an exaggeration and illusory.

### IV.    NEBEL IS NOT QUALIFIED TO OPINE ON WHETHER IT IS COMMON AND EXPECTED FOR A SOFTWARE VENDOR SUCH A MICROS TO PROMPTLY NOTIFY ITS CUSTOMERS ABOUT SECURITY VULNERABILITIES AND FLAWS IN THE VENDOR'S SOFTWARE OR THE MANNER, FORM, QUALITY AND EFFECTIVENESS OF NOTICES.

As noted above, Nebel does not have an experiential basis to express expert opinions on this subject. He has no experience with which to give an expert opinion as to whether or not "it is common and expected [in the POS system industry] for a software vendor" to do anything. He has never worked for a software vendor and not conducted any empirical research on the subject. What an IT security outsourcing company may be contracted to do for a customer is not relevant to what the vendor of a POS product is required or customarily does post-sale, particularly where the merchant does not contract for upgrades.

Nebel is in no position to give an experiential opinion as to what is common and expected of vendors in the POS industry with regard to whether or not they are required by industry standards to notify customers that standards have been created, or have evolved, or that the system they purchased in the past does or does not comply with current standards. It may be a good business decision to do that, but good business decisions are not the equivalent of an expert opinion. Whatever personal opinion Nebel may hold is not based upon his experience in an industry in which they has never worked, but rather is just the personal opinion of Roger Nebel.[8]

---

[8]      The fact that standards may be issued after a POS system is sold, as was the case with the POS system for Nacogdoches which was sold before CISP was issued, or that over the ensuing years the standards evolved, does not as Nebel erroneously claims, make the POS system

Nebel's opinion as to the adequacy and effectiveness of notices which MICROS did in fact give to Cotton Patch regarding security, notifying Cotton Patch of Cotton Patch's obligation to ensure that its system was secure from intrusion via the Internet, Cotton Patch's obligation to upgrade its systems to not store full track data and its obligation to turn off PC Anywhere when it was not in use in order to close the gateway for an intrusion and to use and change unique and complex user IDs and passwords, all of which were ignored by Cotton Patch, is outside Nebel's experiential area of expertise.  He does not have the experiential basis to express opinions as to the effectiveness of MICROS' multiple notices to Cotton Patch.

Nebel has no experiential basis upon which he can be found to be an expert with regard to the wording, quality and effectiveness of customer notices.  Although he now claims  that when he worked for IDefense between 1999 and 2001 he "worked with software vendors to craft notices of [software] security vulnerabilities and vendor patches," the mere fact that he may have been involved with such notices does not support the claim that he is qualified to give expert testimony regarding notices, including when, under vendor/merchant industry standards, they must be given in connection with hardware and software that was sold in the past, or the wording, quality or effectiveness of notices that MICROS sent to Cotton Patch.  No information has been provided with regard to the number of notices with which Nebel was involved at IDefense, his role in the notice process, the content of the notices, or even the vendors with whom he allegedly worked.  During a two year period, over a decade ago, Nebel broadly claims that he was involved with notices given by others on software vulnerabilities.  That does not translate to he is an expert in the area of notices.  There is nothing in his deposition or Affidavit which makes or proves that Nebel is a human factors expert regarding the quality, wording and

---

"flawed."  Such hyperbole is trumpeted solely for the basis of prejudicing the jury in violation of FRE 403.

effectiveness of notices and he has no experience which would make him so.  Nebel frequently, as shown by his deposition, exaggerates his involvement in things and the experience at IDefense does not convert personal opinions, created to serve the purposes of his sponsor, into expert opinions.

## V.   NEBEL'S OPINION AS TO WHETHER OR NOT COTTON PATCH COULD PROPERLY RELY UPON MICROS' ALLEGED REPRESENTATIONS ABOUT SECURITY AND COMPLIANCE OF THE MICROS POS SYSTEM WHEN ASSESSING ITS SECURITY NEEDS IS NOT A SUBJECT FOR AN EXPERT WITNESS.

Although Cotton Patch in its Opposition Memorandum has conveniently swapped the terms "reasonable reliance" for "properly rely," this does not alter the fact that reasonable or proper reliance is an element of Cotton Patch's fraud by nondisclosure, negligent misrepresentation and DTPA claims. *Bright v. Addison*, 171 S.W.3d 588, 599 (Tex. App.— Dallas 2005, pet. denied); *Larsen v Carlene Langford & Associates Inc.*,  41 S.W.3d 245 (Tex.App.-Waco 2001 n. pet.). Nebel's opinions regarding whether Cotton Patch reasonably or properly relied upon MICROS' alleged representations or failure to disclose offers legal conclusions to the fact finder. *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 366 (4th Cir. 1986); *U.S. v. Offill*, 66 F.3d 168, 175 (4th Cir. 2011)(holding that expert testimony which offers a legal conclusion or applies the facts of the case to a legal standard does no more than impermissibly offer the jury the witness' view of how the verdict should read.)

Moreover, what constitutes reliance is a matter of common knowledge and common sense, which the jury is fully capable of deciding without the need of Nebel's personal opinions on reliance.  A jury does not need Nebel to tell them whether or not, under the facts of the case representations were made which Cotton Patch reasonably or properly relied upon or Cotton Patch reasonably or properly relied upon the alleged nondisclosure of information which Cotton Patch claims was deceptively withheld from it.  Those are matters for which a jury, without the

21

opinion of an expert, is fully qualified to assess and determine.  Nebel's opinion would not be helpful to the jury, but rather, would be used to substitute Nebel's judgment for that of the jury. *Scott v. Sears, Roebuck & Co.,* 789 F.2d 1052, 1055 (4th Cir.1986); *Wilson*, 484 F.3d at 277 (The interpretation of commonly known and observable events does not require the opinion of an expert); *Casey*, 823 F. Supp. 2d at 341(Holding that expert testimony on issues that are not helpful to the jury lack the relevance required for expert testimony).

Although Cotton Patch concedes in its Opposition that it would be improper for Nebel to offer opinions which involve legal issues, witness credibility or matters within the common knowledge, understanding or judgment of the jury, Opposition at pp. 7-8, Cotton Patch nonetheless seeks to offer Nebel to give opinions on matters about which Cotton Patch concedes he should not be permitted to opine.  Nebel's views on reasonable and proper reliance are not admissible expert opinions.  They are Nebel's personal views which he should not be permitted to express to the jury under the pretext of expert opinions, substituting his judgment for the judgment of the jury.

## VI. NEBEL'S OPINION AS TO WHETHER COTTON PATCH IS A RELATIVELY UNSOPHISTICATED MERCHANT WITH RESPECT TO IT SECURITY ISSUES IS NOT A PROPER SUBJECT FOR EXPERT TESTIMONY

Similarly to the issue of reasonable and proper reliance, whether or not Cotton Patch is a unsophisticated merchant is a question of fact for the jury.  The jury does not need the assistance of an expert witness to substitute his judgment for the that of the jury, which is fully capable of considering the evidence without the need for  Nebel's "judgment" on the subject.

**VII.  NEBEL'S TESTIMONY REGARDING THE PRESENCE OF MALWARE IN THE SERVER AT THE TIME OF ITS INSTALLATION AT THE NACOGDOCHES RESTAURANT IS NOT RELEVANT TO THE CLAIMS REMAINING BEFORE THE COURT.**

The Court granted summary judgment in favor of MICROS on Cotton Patch's negligence and gross negligence claims.  To attempt to come in through the back door, Cotton Patch asserts that Nebel's opinion that the server was infected with a virus at the time it was installed at the Nacogdoches restaurant in March 2006 is relevant because it relates to the issue of fraud by nondisclosure.  Cotton Patch's theory is that MICROS deliberately remained silent and withheld from Cotton Patch information that the server was infected at the time it was installed.

Putting aside whether Nebel is correct or not with regard to his claim that the server was infected with malware when installed, which is vigorously disputed, there is not a shred of evidence in this case that MICROS was aware of any such infection.  There is no possibility that any such evidence will miraculously be discovered prior to or at trial. At no point in this case has Cotton Patch advanced any evidence whatsoever to suggest that MICROS was aware of the presence of malware on the server at the time of installation, let alone any evidence that it deliberately remained silent as to its presence.  It is up to Cotton Patch to proffer evidence which would support the admissibility of this opinion.  See Casey, 823 F. Supp. 2d at 341 (citing Daubert, 509 U.S. at 591, before the opinion is put before the jury "if the expert's testimony 'does not relate to any issue in the case [, it] is not relevant and ergo, not helpful.'")

This opinion should be precluded because it is not relevant, has no probative value and under Fed. R. Evid 403 has a substantial probability of confusing and prejudicing the jury.

Respectfully submitted,


____/s/Steven A. Allen_____
Steven A. Allen (Federal Bar No. 00607)
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 400
Towson, MD 21204
(410) 339-6769
(410) 832-5602 (facsimile)
sallen@pklaw.com

**Attorney for Defendant MICROS Systems,
Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of June, 2013, Defendant MICROS

Systems Inc.'s Reply Memorandum in Support of its Motion *In Limine* To Exclude Plaintiff

Cotton Patch Cafe Inc.'s Lost Profits Expert Testimony was served via e-filing and by first class

mail, postage prepaid upon:

Robert L. LeMay, Esquire                    Craig D. Roswell, Esquire
Kane Russell Coleman & Logan, P.C.          Niles, Barton & Wilmer, LLP
1601 Elm Street, Suite 3700                 111 South Calvert Street, Suite 1400
Dallas, Texas 75201                         Baltimore, MD 21202

Ryan L. Bangert, Esquire
Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, TX  75201


_____/s/Steven A. Allen_____
Steven A. Allen